# SUPREME COURT.—JANUARY TERM—1860.

## KAKE vs. C. S. HORTON.

WHERE the husband had come to his death by the wrongful act of the defendant, the Court was of opinion, that upon the construction to be given to certain provisions of the statutes of this Kingdom, and as consonant to natural law and reason, the widow could maintain an action on the case to recover consequential damages, resulting from his death.

The Court instructed the jury that the damages, if any to be awarded, must be based upon the plaintiff's loss of support, deprivation of society, etc., as measured by the husband's station in life, age, and ability of earning a livelihood.

The plaintiff is the widow of Charlie (Pihaole,) late steward on the American bark "Frances Palmer," who is alleged to have come to his death by the act of the defendant. She brought the action to recover damages for the loss thus sustained by her.

The most important of the motions preliminary to the trial, was that to dismiss the cause for want of legal ground of action, which was debated at great length. The ruling of the Court, delivered by Justice Robertson, was as follows :

We are of the opinion that much of the law read by the learned counsel for defendant, as well as a great part of their argument, is inapplicable to the question at issue.

They treat the case as if this was an action of trespass brought by the plaintiff to recover damages for an assault and battery, committed on her deceased husband, Charlie Pihaole; whereas, as we understand the matter, it is an entirely different thing, being an action on the case, to recover for consequential damage resulting to the plaintiff by reason of the death of her late husband, which she alleges to have been caused by the wrongful act of the defendant, Horton.

The simple question is, can an action on the case be maintained in the courts of this Kingdom, upon the cause of action set forth in the plaintiff's petition ? and if so, can such action be brought by the widow ?

Whether this action can be maintained upon the grounds relied on in the present case, must, we think, depend upon the municipal laws of the country where the action is brought or of the country where the wrongful act is committed. In the present case the action is brought in the courts of the same country where the act which is said to have occasioned the death of plaintiff's husband is alleged to have been done.

By the Common Law of England, the action would not lie. In the case of Baker *vs.* Bolton *et als,* (1 Campbell's Rep., p. 494,) which was an action against the defendants as proprietors of a stage coach, on the top of which the plaintiff and his late wife were traveling from Portsmouth to London, when it was overturned, whereby the plaintiff himself was much bruised, and his wife was so severely hurt that she died about a month after; Lord Ellenborough, C. J., held that the jury could only

take into consideration the bruises which the plaintiff had himself sustained, and the loss of his wife's society and the distress of mind he had suffered on her account, from the time of the accident until the moment of her dissolution. For that, in a civil court the *death of a human being* could not be complained of as an injury; and the damages as to the plaintiff's wife must stop with the period of her existence.

It is argued by counsel for the defendant, that the Common Law of England is in force in this Kingdom, and that therefore the action cannot be maintained in this Court. In our opinion, this argument is not sound. We do not regard the Common Law of England as being in force here *eo nomine* and as a whole. Its principles and provisions are in force so far as they have been expressly, or by necessary implication, incorporated into our laws by enactment of the Legislature; or have been adopted by the rulings of the Courts of Record; or have become a part of the common law of this Kingdom by universal usage; but no farther. The analogy sought to be set up between the Hawaiian Islands and the British Colonies in North America, (now a part of the United States,) with reference to the Common Law of England, is not, in our opinion, well sustained. We think the circumstances of the two countries are widely different.

Whether or not the present action can be maintained in this Court, depends upon the construction to be given to certain provisions of the Hawaiian Statutes.

The provision contained in the 1116th section of the Civil Code touching the institution of suits to recover damages for injuries direct or consequential is very general in its terms, as indeed such a provision must be, it being impossible for the Legislature to define and enumerate all the various causes for which an action of trespass, or an action on the case, will lie. Such causes are illimitable in their variety. And as has been repeatedly remarked, it is by no means a conclusive objection to an action on the case to say that an action never was maintained for the same cause before. When an action is brought under the general provision referred to, the question whether or not that particular action will lie is a matter for judicial determination, not certainly according to the mere whim or fancy of the Court or Judge, but in accordance with legal principles.

It is provided, in the 14th Section of the Civil Code, which forms a part of the Chapter on the Construction of Laws, that in all civil matters where there is no express law, the Judges are bound to proceed and decide according to equity, applying necessary remedies to evils that are not specifically contemplated by law, and conserving the cause of morals and good conscience.  And, to decide equitably, an appeal is to be made to natural law and reason, or to received usage, and resort may also be had to the laws and usages of other countries.  We think reason and natural justice are clearly in favor of permitting an action to be maintained, upon the grounds relied upon in this case, and upon a resort, for light, to the laws of those countries, to whose authority and opinions we yield the highest veneration, we find that the old harsh rule, which had its origin in feudal times, has been superseded by liberal statutory provisions, more in accordance with justice and with the sentiments and circumstances of an enlightened age.  As we are not fettered by the English Common Law rule on the subject, no legislative enactment is required to remove that obstacle to the maintenance of an action like the present in a Hawaiian Court, and we think it ought to be permitted, as being consonant with natural law and reason, as well as with the laws of civilized countries.

In the case of Carey and Wife vs. Berkshire R. R. Co., 1 Cushing's Rep., page 480, Metcalf, J., intimated an opinion that by the Civil Law, and by the law of France and Scotland, whose jurisprudence is mainly based upon the Civil Law, actions like the present could be maintained.  We regret that we have not had time to verify, by reference to the books, the opinion of so respectable an authority, because this would of itself afford a distinct and sufficient foundation for our decision.  The several Courts of Record having the power, under the 823d Section of the Civil Code, which is not a new provision in our Statutes, but one which has been repeatedly acted upon by this Court, to cite and adopt, at their discretion, the reasonings and principles of the Common Law, or of the Civil Law, so far as the same may appear to the Court to be founded in justice, and not in conflict with the laws and customs of this Kingdom.  If, as is intimated in the case just referred to, the principles of the

Kake *v.* C. S. Horton.

Civil Law would permit the institution of such an action as the present, we have no hesitation in preferring the doctrine of the Civil Law to that of the English Common Law upon this point, for we conceive the former to be pre-eminently "founded in justice."

The principle which we now recognize will become, by judicial adoption, a valuable part of the Common Law of this Kingdom.

With regard to the objection that this action must be brought by the executor or administrator of the decedent, we think such an objection applies merely to the form of enforcing the remedy, and not to the merits of the claim, or the principle upon which it stands. We have some doubt whether, under our statute of practice as it reads at present, an administrator could maintain the action, as such. The provision of the English statute referred to (9 and 10 Vict.) requiring the suit to be brought by the executor or administrator is evidently intended for convenience and to prevent a multiplicity of actions. But the damages recovered in such actions are not general assets in the hands of the administrator, being for the *individual* benefit of the widow, or other party entitled thereto ; and it does not appear by any means *indispensable* that the suit should be brought by the administrator. We think the suit in this case is well brought by the widow.

Motion denied.

R. G. Davis and John Montgomery, attorneys for the plaintiff.

————

The jury, as finally accepted, after numerous challenges for cause, consisted of a mixed jury, half foreigners and half natives.

The marriage of Kake with the deceased Charlie was proved by Rev. Lowell Smith, who performed the marriage ceremony, and by a native who witnessed it.

*Horace Crabb sworn,* deposed—Was customs officer on board " Frances Palmer." Defendant was mate ; Capt. Paty was master. The Captain was, generally speaking, on board except when business called him away. He did not sleep on board,

but was always there in the morning. Heard Horton say to Charlie, "When he was not there to keep supper for him; if he was not going to be there, he would let him know." He was on the poop-deck at the time; Charlie was standing a little lower down, and made no reply that I heard. Charlie descended to the cabin and Horton shortly followed. Horton came up again by the after gangway; next saw Charlie lying on the main deck, near main hatch, his head supported on his father's knee. I heard something like a blow and a fall before I saw him lying on the scuttle. Heard Horton make a remark as he was walking aft, saying, "You'll know better next time, you son of a b——."

*Joseph Ellis sworn*—Visited Horton at the vessel the said Sunday afternoon. Horton, Crabb and self were on the poop-deck smoking; saw Charlie at stern of vessel shaking table cloth, and then go below. Horton told him not to have supper till five o'clock. Charlie came up again five minutes afterwards on the gangway leading up from main to poop deck, on side next to wharf, and said it was his orders to have supper at five o'clock. Heard him mumble something else, but did not understand what he said; then saw Horton go towards Charlie and kick him; the kick was upon the head. He said, "You will," and kicked him. Charlie disappeared below; about fifteen minutes after saw Charlie; Horton told me to go for a doctor. He said, "I have hurt that boy; I wish you would go and get a doctor." Cannot say if I saw Charlie dead or not.

*Orlando H. Houston sworn*—I was employed on board the "Frances Palmer" in October last, by the cook, the afternoon of the 16th. Saw Horton kick Charlie that evening, I should say on the side of the head. Charlie was on the steps on the starboard side of the vessel. The stairs lead from the main deck to the poop. Horton was on the poop when he inflicted that kick. I heard Charlie say that he wanted to get through his work before night, and he was going to. Horton stepped forward and said, "You will, you son of a b——," and inflicted a kick. Charlie fell down upon the deck; he never rose again. There was no ring-bolt where his head struck; it was six or eight inches from where his head struck.

*Cross examined*—I was standing on the starboard side of the

vessel, about two feet forward of the after part of the house; did not see Charlie come up; he was on the steps when I saw him; should say he was standing with his foot on the second step from the top, in the attitude of coming down; his shoulder was just above the combing of the hatch; he was stooping. There is an iron railing there; his hand was not on it. Do not know where his hand was, etc. Has been previously examined in this place, also before coroner's jury; part of testimony there given he had heard read, part not, and had signed it so. Saw Ellis on the poop-deck of the vessel; think he was nearer to the scuttle-way than I was; should think the bench he sat on was forward of the mizzen rigging, on the side opposite Charlie, on the port side the skylight. Horton struck Charlie on the right side of the head, or somewhere in the neighborhood (of the head.) He had no where else to kick him; he kicked him in the neck—not sure whether in the neck or head; he could not kick him anywhere else than on the right side of the head. I am not aware that I swore he kicked him on the right side of the head. The left side of Charlie was turned to me. Anybody standing aft could have seen better than I did. Charlie was in attitude of coming down; he fell bodily all of a heap, and struck on the deck on his posteriors. His face was towards the wharf, the starboard side. I was coming aft at the time; I stood on the same spot as when I first saw him kicked; stopped there when I saw him fall; he fell over backward, after he came down on his posteriors. Horton used the words, "You will, will you, you son of a b——," as he raised his foot to kick him. Horton was facing forward. I was first one who approached him when he fell.

*By the Court*—His face was towards the wharf when kicked, his right side toward Horton, his left side toward me; I could see his head, and part of his shoulders was a little above the beam.

*By a Juror*—Horton was facing the bow of the ship.

*Dr. C. F. Guillou sworn*—Assisted at post mortem examination of body of Charlie. There was considerable extravasation of blood about the base of the brain and the upper portion of the spinal column. There was dislocation of the spine of the third vertebra; the displacement about a half inch to the pa-

tient's right of a straight line along the other vertebræ. We concluded death had been caused by the injury of which I have given the description. I examined the pupils of the eyes; they were dilated in an unnatural way. I concluded from that there was oppression of the brain. The extravasation of blood appeared to be very recent; I thought it was less than a few hours; it might have been produced by an injury inflicted about two or three hours previously. My conclusion was, from the examination, that death was caused by an injury received some few hours before by a blow or violence applied to the back and side of the neck in the vicinity of the third vertebra from the left side, and a position somewhat behind the person receiving it. The vertebra was dislocated to the right. The injury was not likely to result by a person falling down, unless he struck; it might have been caused by a blow on the right side of the head, which caused the head to strike against something hard on the other side. The injury might have been produced by the application of a hard body, not exceeding an inch and a half, applied on a line with the third vertebra from the left side, or somewhat behind, passing towards the right. It need not have had any inclining motion at the time. The direction applied to the blow refers to the perpendicular action. The hard substance might have been stationary and the body moving, and the effect in question produced. The dislocation and extravasation could not have occurred without the application of some external force. From the nature of the extravasation, it must have occurred within a few hours.

*Cross-examined*—It would not necessarily require a violent blow ; it would depend upon the muscular state of the person ; if the muscles were taut, they would resist the blow ; if slack, be more easy to dislocate. If muscles are relaxed, they form no resistance ; if taut, they do. A blow on the right side of the head alone would not make the dislocation spoken of. That is my professional opinion. There was no discoloration on the right side of the head. There was no evidence of any blow by a raising on the right side of the head. There was no indication of injury necessarily applied on right side of the head, but the effusion of blood in that region might have come from laceration of blood vessels lower down. When a man is stand-

ing, the muscles required therefor are contracted, the others relaxed. In a state of intoxication muscles are very apt to be relaxed.

*H. L. K. Wood* testified—That he was sitting on the deck at the time of this occurrence, and that he heard Horton say very kindly to Charlie, that he did not wish him to place supper on the table until he came on board ; if he were intending to be absent at supper he would always let him know of it ; that, presently, Horton went down to the cabin and returned to the deck again, followed up the same gangway by Charlie. Charlie said his hour for supper was five o'clock, and if he was not there, he would have to go without. Horton asked him what he said, and he repeated it. Charley was looking directly over the side of the vessel, standing on the stairs, about down to his shoulders. Horton, after he had asked him what he said, stepped forward and struck him with his foot on the right side of the head ; his head struck against a beam, on the upper part of left ear, and he disappeared from my sight. About three minutes afterwards I saw him lying on the deck, with his head over the combings of the main hatch, supported by some person and restoratives being applied. Horton sent me for a doctor.

In the cross examination, witness said : Charlie spoke in a commanding voice, rather as if he were giving orders to Horton than *vice versa.* Horton struck him with the inside of his right foot, balancing himself upon his left leg, and across his left foot. The steward repeated his expression after Horton asked him what he said. Horton spoke to him in a manner to call the steward's attention to his being outside of his duty—i. e., insolent.

*Dr. S. P. Ford sworn*—Made a post mortem examination of Charlie at the station house, on a Sunday evening in October. I advised them not to hold the post mortem that night, but at 9 o'clock, P. M., they sent for me. It has always been the custom, so far as my experience goes, to let the body lie until it is cold; while the blood is fluid it is embarrassing.

*Question*—If the examination had been postponed until the body got cold and solid, would or would not extravasation of blood from external injuries have been more easily discovered ? (Objected to. Judge Allen ruled that a medical man might

give his opinion upon a given state of facts.   Judge Robertson
thought the objection good.)   Extravasation would not appear
until the parts became rigid perhaps.   Discoloration depends
upon state of the patient.   Should think in such a subject as
Charlie, discoloration would take place in from six to twelve
hours; it is impossible to tell.   The pupils of the eyes were di-
lated to the full extent; it indicates oppression or injury of the
brain.   I removed the scalp and found no extravasation of
blood.   I examined the upper part of the skull.   I removed
the top of the skull and found extensive extravasation in both
temporal regions—more on the right.   We thought at first it
was rupture of the meningine artery, which it proved to be on
examination.   We thought that sufficient cause to account for
the death—were about to discontinue examination any further
at the time.   I then suggested the removal of the brain from
the base of the skull, and found a large amount of extravasated
blood at the base of the brain, with the same appearance fol-
lowing down the spinal marrow.   This appearance induced us
to extend the examination still further.   On laying the spinal
column of the vertebræ bare, we found the third vertebra
of the neck dislocated to the right side, about half an inch from
the medium line of the process of the other vertebræ; there
was no appearance further than that; we extended the exami-
nation no farther.   The rupture of the temporal artery was
sufficient to cause death;   *   *   *   any violent falls or blows
would produce such dislocation; it is not a difficult one; mus-
cular action would, if sufficiently powerful, throw it out—any
sudden jerk.   I should not think it would produce this disloca-
tion.   I should not think that a blow on the left side of the
head, against a beam, would cause the dislocation; it must have
been something coming in contact with the lever of the bone.
Injuries to the head are curious in their effects.   Blows may
be received on one side of the head and produce injuries on
the other side, which is a very common occurrence.   It does
not require a very heavy blow in the temporal region, as a
general thing, to produce a great deal of injury—the skull be-
ing very thin and nearly flat.   I have no way of telling how
heavy the blow was; it would depend upon the force used
whether a kick as described would be sufficient to produce the

Kake *v.* C. S. Horton.

dislocation ; not having seen the blow I cannot judge. I was acquainted with Charlie three or four years ; he served me more or less for three or four years ; he was the best servant I have ever had, etc.; know not why he should not have attained the average age of natives. It is difficult to tell that average ; should think it would be thirty-five to forty.

· *Cross-examined*—There was a rupture of the temporal artery on the right side ; I am sure it was so ; it is not necessarily the case that the brain should be injured at the point where the hit is. The particular injury would have accounted for the extravasation, if we had not made examinations as we went along. We were satisfied in our own minds that was sufficient. The injury at the base of the skull would account for the extravasation. The extravasation in the temple appeared to be confined to itself; a blow on the neck would not account for the extravasation on the head ; a blow on any portion of the head would account for the extravasation. The dislocation of the vertebræ was sufficient to have caused the death ; that injury was the cause of the death. The injury upon the third vertebra was the cause of the death of Charlie, in my opinion ; he never had the venereal to my knowledge while he was with me. His wife was never treated by me for venereal disease.

*By Mr. Montgomery*—If there had been no injury to the vertebra at all, the extravasation of blood from the meningine artery in the temporal region, would have caused the death.

*By Mr. Harris*—I swore in a previous case, that I concurred with what Dr. Guillou had stated, and that I had nothing to add to it. The death might have resulted from the extravasation, and the dislocation have taken place after the body fell. He could not have dislocated his vertebræ by falling on the flat deck ; the head striking the deck, the concussion might cause the dislocation.

*By a Juror*—My opinion in my former examination at the coroner's jury was, that the kick was the cause of the death. A man could kick strong enough to cause the death.

*W. C. Parke sworn*—I hold the office of Marshal of the Islands. I know the defendant; I recollect the Sunday Charlie came to his death. I had an interview with Horton that evening between six and eight o'clock; he came to my house in the valley,

near church time; he came into my house in a very excited manner, and said he had killed one of the hands on board the "Frances Palmer," and had come to deliver himself up to me. I saw he was excited, and then I asked him if the man was dead; he said he did not know, but he supposed that he was. I then asked him who it was, and he said it was Charlie, the steward. I then left the house in company with him and proceeded to the prison and locked him up. On my way down I asked him how it took place. He said he had been out that afternoon making visits to some of his friends, and upon returning he found the supper table cleared away; he said then he called the boy Charlie, and told him in future not to clear away until he returned, and told him to get him some supper. He said the boy used very insulting language to him, which made him angry and that he kicked him in the head. I asked him how he could kick him in the head. He answered that he was walking on the poop-deck, walking fore and aft, and that the boy came up upon the stairs from the lower deck, and was standing on the stairs at the time that ke kicked him. I asked whether the kick or the fall on deck killed the boy. He said he didn't know. He said he did not suppose he had killed the boy, that he went for a doctor, and had applied hartshorn himself. He appeared to feel bad, and said he had no intention of hurting the boy.

*Cross-examined*—He came voluntarily to my house.

*Elemakule sworn*—Said he knew that the deceased had lived amicably with his wife, and provided well for her support at all times. Two other native witnesses testified to same effect. *Governor Kekuanaoa* testified the signature of Keaukai to the marriage license of Pihaole and Kake. *Dr. Judd* testified his opinion that the average age of natives is 35 years, if they reach the age of 22 or 23 in good health. *W. F. Jourdan*—Had seen the plaintiff and her husband walking and talking together. Had seen them on board ship.

*P. S. Wilcox*—Was slightly acquainted with Horton; Horton had asked him the other day if there was any part of the "Comet" for sale. Didn't know anything about Horton's property.

*A. N. Clarke*—Horton had told him that he hoped at some time to be captain of a ship of which he had a part interest.

*Horace Crabb* deposed he had seen Charlie take drinks that Sunday afternoon, etc.

The plaintiff here rested, and the defense was opened to the jury by Messrs. Harris and McCully, the final argument for the defense being made by J. D. Blair.

The defendant called *Wood* to show that Charlie had bottles of spirits, and invited his friends to drink that afternoon; and *Capt. Smith,* that Charlie was addicted to drinking to a degree that he was not trustworthy.

*Dr. C. F. Guillou sworn*—I remember substantially the facts upon which my evidence was given in the former case. I am willing to swear to them as facts. The injury, as evidenced from the examination must, in my opinion, have been applied to the left side and somewhat from behind, in the region where the head and neck meet. There was no bruise or superficial injury either on the head or neck. The effusion of blood about the brain might have caused death, but the injury of the neck, the dislocation, would then have been omitted in the estimate of causes, and is itself a sufficient and more constant cause of death than the effusion alone. There was no abrasure about the head or neck externally, nor any bruise internally; upon removing the skull-cap the effusion of blood was observed in both temporal regions, beneath the *dura mater,* and apparently in its tissue. In opening the *dura mater* and raising the brain, a large quantity of blood was found about the base of the brain and the opening of the spinal column. The *dura mater* is a thick membrane that covers the brain. I looked for rupture of the meningeal artery, but was unsuccessful in finding any. The meningeal artery runs between the skull and the coverings of the brain, and sends small branches for the nourishment of both of them into their respective tissues. Although there was dislocation of the third vertebra, there was no thickening or apparently unnatural growth about the dislocated part or those adjoining, and this absence induced me to conclude the injury to be recent. The blood effused about the base of the brain might be caused by the same injury as produced the dislocation of the neck. There was no bruise externally or internally on

that side of the head. The dislocation is the greatest of the manifest causes of death, and therefore the most probable one.

*Cross-examined*—I discovered, upon removing the blood, considerable extravasation of blood in both temples. The discoloration from presence of blood beneath or within the *dura mater*, extended some distance above the line at which the separation of the skull was made, say an inch or inch and a quarter, with indistinct edges. The thickness of the layer of blood was not estimated ; the *dura mater* was opened in search of the effusion; the quantity of effusion was sufficient to cause death, if nothing else had been found. Effusion seldom occurs without shock, nervous shock ; slight effusion may accompany and fix the fact of shock. The bone at the temporal region is thinner than the other part of the head—the thinnest. The temporal bone is very complex ; there is a flat portion to it in the region commonly called the temple. From the thinness of the bone and flatness, a greater injury is more easily inflicted upon that part of the head by the same force than on any other; a slight blow might cause effusion of blood internally. I did not find a ruptured vessel at all. Dr. Ford and I concurred in all the results that we arrived at in this examination, to the best of my knowledge. I have never seen or heard Dr. Ford's testimony, but we had a conversation over the body. I was requested to give my evidence first, and having other occupation, then left the room. I found no rupture in the temporal artery, nor did Dr. Ford in my presence ; the temporal artery is outside the skull, and no injury was, to the best of my knowledge, observed outside the skull, therefore, no injury of the temporal artery was observed or probably existed. The meningeal artery is a branch of the internal maxillary, as my memory is, and not of the temporal artery. It would be proper, in common parlance, to call the meningeal artery in the neighborhood of the temple. The post mortem examination occurred from three to four hours after the death. Had there been contusion, bruise of the soft tissues, the discoloration or the evidences of it, would have been more manifest several hours afterwards, particularly if, on that part of the body which was undermost in the position in which the body was lying or might continue to lie after death. I have no distinct recollection of any verbal concur-

rence in such opinion by Dr. Ford. If Dr. Ford said he had found a rupture of any blood vessel in my presence, I should think it incorrect on that occasion. Extravasation means an escape of blood from the vessels naturally containing it; it is blood outside the vessel; it may get out by exudation, but the quantity observed here justified the supposition of laceration or bursting, and under that impression I sought for the injured vessel, but did not find it. The extravasation must have been caused by an injury inflicted within a few hours previous, from the condition of the blood and brain.

*By Mr. Blair*—The extravasation of blood about the base of the brain might be caused by the same injury that produced the dislocation. The skull is thick on the side of the upper part of the head; it is thick and arched and capable of resisting.

*Mrs. A. P. Everett sworn*—In a trip on the "Frances Palmer," Kake on board, Kake had told her in reply to inquiry, that Charlie used to strike her, and once when he struck her she lost her eye a few days after in consequence. Inquired if he was in the habit of striking her often, and she said yes; she intimated to me that her husband was not very kind to her.

*Cross-examined*—She told me she lost her eye after her marriage with Charlie.

*Miss Fanny Paty*—Made the passage at same time with preceding witness. Kake told me that Charlie had given her a knock on the back of her head, so that she lost her eye. That is the only time that I gathered from her that he had beat her, that she was made insensible by the blow.

*Cross-examination*—Kake did not say how long after her marriage it was, or whether it was, before or after marriage.

*F. L. Hanks sworn*—Charlie had told him that he put out Kake's eye.

*Cross-examined*—I have no idea whether he said it was before or after marriage.

*H. T. Fitch sworn*—Testified that in his opinion Charlie was "tight" on the noon of said Sunday. *Capt. Smith* knew that Charlie would not have been insolent when sober. *Rev. Lowell Smith* recollected distinctly that, when he married Charlie and Kake, she had a handkerchief bound over one eye—couldn't say

which one.  *W. E. Cutrell* and *Daniel Burns*, saw Charlie on
said Sunday afternoon; thought him sober.  *Jacob P. Manuel,.*
saw Charlie on said Sunday afternoon; thought him sober.
Kake's eye was out in December, 1854. . (The marriage was
February 13, 1855.)  *Elemakule* and *Kui* swore Kake's eye was
injured before her marriage.

The Court, per Justice ROBERTSON, charged the jury in sub-
stance as follows :

This is not a re-trial of the case of Rex *vs.* Horton for man-
slaughter.  The issues in the two cases are somewhat different,
and so are the rules by which the two cases are to be decided.

There are three principal questions in this case :

1. As to whether or not this action can be maintained in
law.  This is a question for the Court, and has already been
decided in the affirmative.  This is said to be a novel case;
and so it is in the Courts of this Kingdom.  But in the Courts
of those countries to whose judicial decisions we are accus-
tomed to look with veneration, such actions have ceased to be
novel.  True, by the Common Law of England, the action
would not lie, for, as Lord Ellenborough, C. J., said, 1 Camp-
bell's Rep., " The death of a human being could not be alleged
as a cause of action in a civil court.  But the law of England
in regard to this matter, has been altered by statute ; and the
change thereby introduced has been adopted in several of the
United States.  As an illustration of the principle upon which
this action is founded, I may suppose the case of the widowed
mother of an only son, upon whose exertions she is dependent
for her subsistence ; and suppose that her son comes to his
death by the wrongful or reckless act of some third party,
thereby causing the mother to lose her support, shall she be
left to pine out the evening of her days in sorrow, and, it may
be, in poverty and want, without redress ?  It seems to me that
if any one in the world has a good claim for reparation it is
such a mother.  And is not the claim of a widow for the loss
of her support analogous to that of a mother ?"

2. The first question for you to consider is, has the plaintiff made out a case entitling her to a verdict for damages at the hands of the jury.

And this involves several subordinate questions. [Here the Judge repeated in substance the evidence touching the occurrence which ended in Charlie's death.] Was Charlie's death caused by the act of Horton; intentionally or unintentionally? It makes no difference which, if unjustifiable. It is said on the part of the defendant, that he was administering deserved chastisement to the steward. There can be but one opinion in the Court or the jury-box, in regard to the authority of masters and officers of ships. It ought to be sustained to the full so far as the exigencies of the business in which they are engaged render it necessary. But their authority must be exercised with prudence, and as much care as circumstances will admit. They are entrusted with large authority, and the responsibility attending its exercise is commensurate with its extent. There is a great difference between a ship at sea and a ship in port. If the crew or a part of the crew of a ship at sea should mutiny or refuse to do their duty, it might be the right and the duty of the master and officers to compel obedience at all hazards. But in the case of a ship lying quietly in harbor, if the crew should refuse duty, the master and officers may not enforce obedience to their orders by force of arms. They must seek another remedy. In this case the "Frances Palmer" was "tied up" at the wharf. Were the circumstances such as to justify Horton in inflicting immediate punishment on Charlie? Was there any danger of mutiny, or of insubordination of others of the crew, instigated by Charlie's disrespectful language to his superior, and was the ship or anything on board of her put in peril? True, the master was not on board at the moment. But he was close at hand—easily accessible—ready to hear complaints and redress grievances. And what was Charlie's offense? He had committed no overt act of disobedience. His offense was simply his insolent language. Again, *if* the circumstances were such as to warrant immediate punishment, was the punishment administered proper in kind and degree, and was it inflicted in a proper manner? If the officer

inflicted punishment not justified by the circumstances of the case, or in an improper manner or degree, he did so at his peril; and if evil consequences resulted therefrom he is responsible.

Did Charlie lose his life through his own fault, or by reason of his being intoxicated ? It is argued that when struck he was retreating down the steps, from the impending blow, and may have lost his foothold. If he was endeavoring to avoid the blow by retreating, then the injury was not the result of his own negligence. And if he was looking in another direction, and did not see the blow coming (as the testimony would seem to indicate,) then he had no opportunity to avoid it. But it is said he was drunk. [Referred to the testimony touching this part of the case.] Although he had been drinking, it appears he was able to go about his work as usual, and he went up and stood upon the gangway steps without support. But if you think it is proved that he was so much intoxicated that he had lost the control of his muscles and his foothold, to such an extent that it materially contributed to his death, you ought to weigh that circumstance in mitigation of damages.

3. If the plaintiff is entitled to recover damages, then the question is how much ?

The measure of damages is not the injury done to Charlie in his person, but the injury sustained by the plaintiff by reason of the death of her husband. The damages in this case must be assessed on the principle of compensation or reparation to the plaintiff, and not that of punishment to the defendant. In an aggravated case, where the death had been caused intentionally, and accompanied by circumstances of cruelty or barbarity, the jury might perhaps be authorized to give vindictive damages as a punishment to the defendant and a warning to others. But this is not such a case ; you will consider the plaintiff's loss of support, and her deprivation of the society, comfort and fellowship of her husband. Her loss must be estimated in a great measure by her husband's station in life, by his age, by his means of earning money, etc. But you are not to take into consideration the anguish of mind, be it great or small, which the plaintiff may have suffered from the loss of her husband. You will ascertain the damages, if any are awarded, in whatever way you may deem proper, keeping in

view the basis which I have indicated. But I may be allowed to suggest that one way of compensating the plaintiff for her loss of support, would be to award her such a sum as would, if placed at interest, procure her an income sufficient to provide her with the necessaries of life.

---

The jury, after an absence of twenty hours, rendered a verdict for the plaintiff in $1100.