THE SCHOONER ROBERT LEWERS CO. v. KEKAUOHA.

(Circuit Court of Appeals, Ninth Circuit. March 17, 1902.)

No. 705.

1. WRONGFUL DEATH—RIGHT OF ACTION—LAWS OF HAWAII.
   Act April 30, 1900, to provide a government for the territory of Hawaii (section 1), provides that the phrase "laws of Hawaii," as used in the act, shall mean the constitution and laws of the republic of Hawaii in force at the time of annexation. Section 6 provides that "the laws of Hawaii not inconsistent with the constitution and laws of the United States or the provisions of this act shall continue in force, subject to repeal," etc. The statutes of the republic of Hawaii (Civ. Laws Hawaii 1897, § 1109) provide that "the common law of England, as ascertained by English and American decisions, is hereby declared to be the common law of the Hawaiian Islands in all cases, except

114 F.—54

as otherwise expressly provided by the Hawaiian constitution or laws, or fixed by Hawaiian judicial precedent, or established by Hawaiian national usage." In 1860 the supreme court of Hawaii, authorized thereto by the laws of the kingdom, expressly rejected as a part of the common law of the islands the rule of the English common law that a civil action could not be maintained to recover damages for wrongfully causing the death of a person, and sustained the right of a widow to sue for the wrongful death of her husband; and the rule so adopted has never since been changed by statute or decision. *Held* that, by virtue of the above statutory provisions, such rule is still in force as a part of the common law of the territory, and that the right of action given thereby may be enforced in a court of admiralty as well as a court of law.

**2. SAME—NEGLIGENCE—BREAKING OF SHIP'S TACKLE.**

The breaking of a chain furnished and used by the officers of a ship in unloading a heavy article, of which removal they had sole charge, if unexplained, is prima facie evidence of negligence, which authorizes a judgment against the owners of the ship for damages for the death of a person caused thereby, in the absence of proof of contributory negligence.

**3. SAME—CONTRIBUTORY NEGLIGENCE.**

Libelant's husband, a drayman, was killed while assisting to unload from a ship a heavy bedplate, weighing several tons. While the bedplate was suspended by the ship's tackle, a part of the tackle broke, and deceased attempted to avoid the danger by climbing onto the deck of the ship, but was caught and crushed between the bedplate and the ship's side. *Held*, that he was entitled to rely on the safety of the tackle, and was not chargeable with contributory negligence because, in the presence of imminent and unexpected danger, he did not act with deliberation.

Appeal from the District Court of the United States for the Territory of Hawaii.

William O. Smith and Abraham Lewis, Jr., for appellant.
T. McCants Stewart, for appellee.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

ROSS, Circuit Judge. This is an appeal by the owner of the schooner Robert Lewers from a decree rendered by the United States district court for the territory of Hawaii awarding damages to the appellee for the accidental death of her husband, Enoka Kekauoha. The deceased was one of four draymen employed by Hustace & Co., of Honolulu, who had come on the wharf at that city, to which the schooner was tied, for the purpose of loading and hauling away a bedplate weighing 12½ tons, which had been taken to Honolulu from San Francisco by the schooner, and was then on board. The captain and officers of the schooner were engaged in removing the bedplate from the schooner onto trucks placed on the wharf by the draymen. The bedplate had been lifted from the schooner, and hung suspended by ropes and blocks attached to the main and mizzen masts of the schooner. A guy line or outhaul was fastened to an opening in the center of the bedplate, and carried to a large boiler lying on the wharf. By pulling on the outhaul the bedplate was drawn over the vessel's side, remaining suspended in the tackles, which were connected by falls to the main and mizzen masts. The lashings, lines, and fastenings were all of rope, with the exception of one chain around the

bedplate, and to which one end of the outhaul was fastened, and one chain around the boiler on the wharf, to which the other end of the outhaul was fastened. The tackle, lines, chains, and fastenings were the property of the schooner. Because of the position in which the truck had been placed by the draymen, the plate was not coming squarely down over the truck, and the drayman suggested that it be hauled out a trifle further. While it was in this position, one of the chains, about 15 feet in length, attached to the outhaul, broke, causing the bedplate to swing back to the vessel. At the time the chain broke, the deceased, in order to avoid the danger, ran to the vessel's side, and endeavored to get on the deck, but was caught by the plate and held up against the side of the schooner, thereby receiving injuries from which his death resulted. His widow thereupon filed in the court below a libel in personam against the owner of the schooner for damages resulting from the death of her husband, which she therein alleged was caused by the negligence of the officers of the ship. An answer was filed by the owner of the schooner, setting up that no cause of action lay in the court of admiralty for such damages, inasmuch as there was no act of congress or territorial statute giving any cause of action by reason of the decedent's death, and also denying any negligence on the part of the officers of the schooner, and averring contributory negligence on the part of the deceased. The court below held against the defendant on each point, and gave the libelant judgment for the sum of $1,577.12, with costs.

It is insisted on the part of the appellant that no cause of action for damages will lie in a court of admiralty within the territory of Hawaii for the death of a human being. That by the common law no civil action lies for an injury which results in death is well settled, and is now not denied. And since the decision of the supreme court in the case of The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358, in which the theretofore conflicting decisions are referred to, and the question considered and determined on principle, it does not remain open to question that such an action will not lie in the courts of the United States under the general maritime law. In many jurisdictions, however, the rule has been changed by statute; and where by statute a right of action is given, whether arising on the land or on the sea, it is uniformly held that courts of admiralty, as well as courts of law, will entertain and enforce it. The Harrisburg, supra, and cases there cited; The Corsair, 145 U. S. 335, 12 Sup. Ct. 949, 36 L. Ed. 727; The Willamette, 18 C. C. A. 366, 70 Fed. 874, 31 L. R. A. 715; Laidlaw v. Navigation Co., 26 C. C. A. 665, 81 Fed. 876; Association v. Christopherson, 19 C. C. A. 481, 73 Fed. 239, 46 L. R. A. 264. The death here complained of occurred within one of the territories of the United States,—that of Hawaii,—over which the court below confessedly had admiralty jurisdiction, including the suit of the appellee, if there was any right of action in her. That depends upon the law prevailing in that territory at the time of the death in question.

The first, fifth, and sixth sections of the act of congress of April 30, 1900, to provide a government for the territory of Hawaii, are as follows:

"Section 1. That the phrase 'laws of Hawaii,' as used in this act without qualifying words, shall mean the constitution and laws of the republic of Hawaii, in force on the twelfth day of August, eighteen hundred and ninety-eight, at the time of the transfer of the sovereignty of the Hawaiian Islands to the United States of America. The constitution and statute laws of the republic of Hawaii then in force, set forth in a compilation made by Sydney M. Ballou under the authority of the legislature, and published in two volumes entitled 'Civil Laws' and 'Penal Laws,' respectively, and in the Session Laws of the legislature for the session of eighteen hundred and ninety-eight, are referred to in this act as 'Civil Laws,' 'Penal Laws,' and 'Session Laws.'"

"Sec. 5. That the constitution, and, except as herein otherwise provided, all the laws of the United States which are not locally inapplicable shall have the same force and effect within the said territory as elsewhere in the United States: provided, that sections eighteen hundred and fifty and eighteen hundred and ninety of the Revised Statutes of the United States shall not apply to the territory of Hawaii.

"Sec. 6. That the laws of Hawaii not inconsistent with the constitution or laws of the United States or the provisions of this act shall continue in force, subject to repeal or amendment by the legislature of Hawaii or the congress of the United States." 31 Stat. 141.

Among the statute laws of the republic of Hawaii set forth in the compilation by Mr. Ballou is the following:

"Sec. 1109. The common law of England, as ascertained by English and American decisions, is hereby declared to be the common law of the Hawaiian Islands in all cases, except as otherwise expressly provided by the Hawaiian constitution or laws, or fixed by Hawaiian judicial precedent, or established by Hawaiian national usage, provided, however, that no person shall be subject to criminal proceedings except as provided by the Hawaiian laws." Civ. Laws Hawaii 1897, p. 447.

Turning to the decisions of the supreme court of Hawaii, we find that the precise right asserted and sustained in the present case was there asserted and sustained as early as 1860,—nearly 40 years prior to the passage of the act of congress of April 30, 1900. Kake v. Horton, 2 Hawaii, 209. The reasons for the decision are thus stated by the court in its opinion:

"By the common law of England, the action would not lie. In the case of Baker v. Bolton, 1 Camp. 493, which was an action against the defendants as proprietors of a stagecoach on the top of which the plaintiff and his late wife were traveling from Portsmouth to London, when it was overturned, whereby the plaintiff himself was much bruised, and his wife was so severely hurt that she died about a month after, Lord Ellenborough, C. J., held that the jury could only take into consideration the bruises which the plaintiff had himself sustained, and the loss of his wife's society and the distress of mind he had suffered on her account from the time of the accident until the moment of her dissolution, for that in a civil court the death of a human being could not be complained of as an injury, and the damages as to the plaintiff's wife must stop with the period of her existence. It is argued by counsel for the defendant that the common law of England is in force in this kingdom, and that therefore the action cannot be maintained in this court. In our opinion, this argument is not sound. We do not regard the common law of England as being in force here eo nomine, and as a whole. Its principles and provisions are in force so far as they have been expressly or by necessary implication incorporated into our laws by enactment of the legislature, or have been adopted by the rulings of the courts of record, or have become a part of the common law of this kingdom by universal usage, but no farther. The analogy sought to be set up between the Hawaiian Islands and the British colonies in North America (now a part of the United States) with reference to the common law of England is not, in our opinion, well sustained. We think the circum-

stances of the two countries are widely different. Whether or not the present action can be maintained in this court depends upon the construction to be given to certain provisions of the Hawaiian statutes. The provision contained in the 1116th section of the Civil Code touching the institution of suits to recover damages for injuries, direct or consequential, is very general in its terms, as, indeed, such a provision must be; it being impossible for the legislature to define and enumerate all the various causes for which an action of trespass or an action on the case will lie. Such causes are illimitable in their variety. And as has been repeatedly remarked, it is by no means a conclusive objection to an action on the case to say that an action never was maintained for the same cause before. When an action is brought under the general provision referred to, the question whether or not that particular action will lie is a matter for judicial determination,—not, certainly, according to the mere whim or fancy of the court or judge, but in accordance with legal principles. It is provided in the fourteenth section of the Civil Code, which forms a part of the chapter on the 'Construction of Laws,' that, in all civil matters where there is no express law, the judges are bound to proceed and decide according to equity; applying necessary remedies to evils that are not specifically contemplated by law, and conserving the cause of morals and good conscience. And to decide equitably, an appeal is to be made to natural law and reason or to received usage, and resort may also be had to the laws and usages of other countries. We think reason and natural justice are clearly in favor of permitting an action to be maintained upon the grounds relied upon in this case; and upon a resort, for light, to the laws of those countries to whose authority and opinion we yield the highest veneration, we find that the old, harsh rule, which had its origin in feudal times, has been superseded by liberal statutory provisions, more in accordance with the sentiments and circumstances of an enlightened age. As we are not fettered by the English common-law rule on the subject, no legislative enactment is required to remove that obstacle to the maintenance of an action like the present in a Hawaiian court; and we think it ought to be permitted, as being consonant with natural law and reason, as well as with the laws of civilized countries. In the case of Carey v. Railroad Co., 1 Cush. 480, 48 Am. Dec. 616, Metcalfe, J., intimated an opinion that by the civil law, and by the law of France and Scotland, whose jurisprudence is mainly based upon the civil law, actions like the present could be maintained. We regret that we have not had time to verify, by reference to the books, the opinion of so respectable an authority, because this would of itself afford a distinct and sufficient foundation for our decision. The several courts of record having the power, under the 823d section of the Civil Code, which is not a new provision in our statutes, but one which has been repeatedly acted upon by this court, to cite and adopt, at their discretion, the reasoning and principles of the common law, or of the civil law, so far as the same may appear to the court to be founded in justice, and not in conflict with the laws and customs of this kingdom, if, as is intimated in the case just referred to, the principles of the civil law would permit the institution of such an action as the present, we have no hesitation in preferring the doctrine of the civil law to that of the English common law upon this point, for we conceive the former to be pre-eminently 'founded in justice.' The principle which we now recognize will become, by judicial adoption, a valuable part of the common law of this kingdom. With regard to the objection that this action must be brought by the executor or administrator of the decedent, we think such an objection applies merely to the form of enforcing the remedy, and not to the merits of the claim, or the principle upon which it stands. We have some doubt whether, under our statute of practice, as it reads at present, an administrator could maintain the action, as such. The provision of the English statute referred to (9 & 10 Vict.), requiring the suit to be brought by the executor or administrator, is evidently intended for convenience, and to prevent a multiplicity of actions. But the damages recovered in such actions are not general assets in the hands of the administrator, being for the individual benefit of the widow, or other party entitled thereto, and it does not appear by any means indispensable that the suit should be brought

by the administrator. We think the suit in this case is well brought by the widow."

As will have been observed, the supreme court there expressly declared, "The principle which we now recognize will become, by judicial adoption, a valuable part of the common law of this kingdom." Such judicial modification of the common law the legislature of Hawaii expressly sanctioned and ratified by section 1109 of Ballou's compilation of the laws of that country, which, as has been seen, was, in turn, sanctioned and ratified by section 1 of the act of congress of April 30, 1900, above set out. There was therefore statutory authority for the right asserted, and sustained by the court below.

It is a mistake to say, as do the counsel for the appellant, that the case of Kake v. Horton was overruled by the later case of Bishop v. Lokana, 6 Hawaii, 556. That was an action of trespass quare clausum fregit, brought by the owner of the land trespassed upon, who subsequently died, and whose executors thereafter appeared in court and filed a suggestion of her death, and prayed that the suit might proceed to final judgment. The court granted a motion to set aside the appearance of the executors, saying, "Actions for injury to real estate do not survive to the executor or administrator, for the real estate passed to the heir or devisee, and not to the personal representatives." At the end of the opinion the judge delivering it said, "I notice in Kake v. Horton, 2 Hawaii, 213, that this court doubted whether an administrator could maintain an action for damage on the death of a person, but allowed the widow to maintain the suit." So far from the case of Bishop v. Lokana overruling the doctrine announced in the case of Kake v. Horton, the clause last quoted from Bishop v. Lokana indicates, rather, an approval of that ruling.

The only other questions presented by the record relate to the alleged negligence on the part of the defendant, and the alleged contributory negligence of the deceased. We think there is sufficient evidence to establish the alleged negligence on the part of the defendant. The officers of the ship were engaged in delivering the bedplate to the draymen, and had exclusive control in the premises. The ropes, chains, and other appliances were the ship's, for the sufficiency and good order of which its owner was responsible. That the accident occurred by reason of the breaking of one of the chains is not denied. The fact that the chain broke, resulting in the damage complained of, unexplained, is prima facie evidence of negligence. A portion of the chain in question was produced in court by the defendant, but not the link or part that broke. The part exhibited is characterized in the opinion of the trial court as "an old five-eighths of an inch chain," and the court added that it "certainly did not look strong enough for the purpose" for which it was used. J. F. Haglund, a sea captain, and witness on behalf of the defendant, testified that iron becomes brittle after it gets old, and that sea captains prefer ropes, "because," said the witness, "we can't always rely on a chain." We are of the opinion that the record contains sufficient evidence to justify the finding of the court

below of negligence on the part of the owner of the schooner. And we are further of opinion that the court below was quite right in holding that no contributory negligence on the part of the deceased was shown. He was not bound to anticipate that the chain would break. On the contrary, he was legally entitled to rely upon the supposition that it would not. And when the imminent danger unexpectedly arose, the fact that he did not run some other way than he did, in his effort to get out of harm's way, is wholly insufficient to show contributory negligence; for, as was well said by the court below, "in the presence of great and unforeseen danger no man is expected to act with deliberation."

The judgment is affirmed.