# M. P. FERREIRA, DEFENDANT IN ERROR, *v.* HONO-LULU RAPID TRANSIT & LAND COMPANY, PLAINTIFF IN ERROR.

## ERROR TO CIRCUIT COURT, FIRST CIRCUIT.

ARGUED FEBRUARY 23, 1905.          DECIDED APRIL 7, 1905.

FREAR, C.J., HARTWELL, J., AND CIRCUIT JUDGE DE BOLT IN PLACE OF WILDER, J.

STREET CAR ACCIDENT—*contributory negligence—proximate cause.*

One may be liable for injuring another even though the latter has negligently placed himself in a position of danger, and even though it was possible for him, if he had chosen the right course, to extricate himself from such position in time to avoid injury, if it was apparent or ought to have been apparent to the former that the course actually pursued was not likely to be effectual, as, for example, when an electric car going at an ordinary or excessive speed ran into and killed a boy who was riding horseback ahead of the car in a narrow space between the track and one side of the street, and it was or ought to have been apparent to the motorman that there was danger of a collision owing to the fright and fractiousness of the horse and the probable failure of the boy to keep it away from the track on the narrow side,—which the boy was trying to do rather than cross over to the other and wider side of the street.

INSTRUCTIONS—*applicability.*

It is not error to refuse to give instructions that are inapplicable to the facts of the case even though they may be correct as abstract propositions or as applicable to other facts.

ID.—*refused—substantially covered by other instructions.*

It is not error to refuse requested instructions the substance of which is sufficiently covered by other instructions that are given.

EVIDENCE—*what admissible on question of damages in action for death by wrongful act.*

>   In an action by a father for the death of his son, evidence is admissible, on the question of damages, tending to show the capability of the son to earn certain wages in the class of work in which his father is engaged, the kind and value of the services actually performed by the son for his father before his death, and the size and character of the father's family.

DEATH BY WRONGFUL ACT—*action for.*

>   An action may be maintained in this jurisdiction by a father for the death of his son caused by the negligence of another.

ID.—*damages—not excessive.*

>   A verdict of $3000 in an action by a father for the death of his son is not so excessive as to require a new trial, when there was evidence that the son was 15 years old, healthy and strong, that he performed services worth $25 a month to his father and which might be worth $35 a month to others, that he might earn $2 a day in the occupation in which his father was engaged, that the father had a wife and ten children, and that the funeral expenses were $216.50.

## OPINION OF THE COURT BY FREAR, C.J.

This is an action for damages for the death of the plaintiff's son, who was killed in a collision with one of the defendant's electric cars on November 12, 1901. A verdict was rendered against the defendant, the plaintiff in error, for $3000. There are forty-five assignments of error.

The accident occurred under the following circumstances: The plaintiff's son Manuel, with two others, Kapena and Holt, were riding on horseback down Liliha street between Wyllie and Judd streets in Honolulu on the northerly side of defendant's track. As the space between the track and the side of the street narrowed Kapena and Holt crossed over to the southerly side of the track and called to Manuel to do likewise, but the latter replied that he was all right and that there was plenty of room on his side, and continued on that side. His horse became uneasy as the car approached from behind and the nearer the car came the more frightened did the horse become,

Manuel meanwhile endeavoring to keep the horse from the track, until finally, when the car overtook him the horse got in front of the car and was struck by it and the boy was thrown off and run over by the car. The car was on a down grade going at a rate variously estimated, but no attempt was made to slow down or stop the car until the collision occurred. When the car was stopped the boy was found dead under the front wheel on the northerly side.

The main question is whether the evidence as a whole shows that the plaintiff made out a case upon which a verdict for him can be supported on the evidence. This question is raised by exceptions taken to the refusal to order a nonsuit at the close of the plaintiff's case and a refusal to direct a verdict at the close of the defendant's case. The defendant contends that no negligence was shown on the part of its employees in charge of the car, and that if there was such negligence there was also contributory negligence on the part of the boy. The question is whether there was any substantial evidence upon which the verdict could properly be based. It is not a question of the strength or weight of the evidence or the credibility of the witnesses, or whether the jury might properly have found for the defendant but whether it might properly have found, as it did find, for the plaintiff. Many of the principles of law involved in cases of this kind are set forth in *Dong Chong v. Rapid Transit Co.,* ante, p. 272, and the ground there covered need not be traversed again in the present case.

Much testimony was introduced upon the question of the speed with which the car was moving at the time. The only person who saw the accident besdies Manuel's two companions, already mentioned, were the conductor and motorman of the car, who left the Territory before the trial and whose testimony was not obtained, a boy named Fuller, who was the only passenger, and a woman named Kaili, who was on the veranda of her house about 450 feet away. Kapena testified that the car was going fast—about twenty miles an hour he thought by comparison with the speed of a horse with which he was familiar,

he never having ridden on an electric car. Kaili testified that it was running fearfully. Fuller testified that it was going very fast and that when it was suddenly stopped at the time of the collision, he, then standing up and holding on to the arm of a seat, was nearly thrown from the car. The defendant endeavored to show that the car was going at a very moderate rate—by calculations from the supposed distance between the car and the boys when the car first came in sight of Kaili, the supposed distance from where the boys were at that time to where the accident occurred, and the rate of speed at which the boys were riding, which, as all agree, was slow; also by testimony as to how near to the car, when it stopped, hoof marks were found on the ground on the northerly side of the track soon after the accident, and as to the distance within which the car in question was stopped when going at different rates of speed at the place in question some time afterwards, etc., etc. Whether the evidence upon this point taken as a whole was sufficient to justify the jury in finding, if it did so find, that the car was moving at a dangerous rate of speed or at a speed in excess of that, namely, 12 miles an hour, allowed by law at that place, it is unnecessary to say, although it may be stated that some of the assumptions relied upon by the defendant in making these calculations are not of a very satisfactory character and that the result arrived at from these calculations is such a low rate of speed as to suggest possible error in such result, considering all the circumstances. What the jury found in regard to the rate of speed does not appear, as the verdict was general, but even if it found that the rate was no greater than the evidence of the defendant alone would justify it in finding, still there were other circumstances which taken in connection with such rate of speed would support a verdict for the plaintiff.

We cannot say as a matter of law that it was negligent for the boy to ride on horseback on the northerly side of the track, although the space between the track and the side of the street at that point was perhaps not over nine feet in width. His horse was gentle and tame and had been ridden by him for

several years, and up and down the street in question many times. Even if the boy was negligent in riding upon that side of the street, it would not necessarily follow that such negligence was a proximate cause of the accident so as to avoid liability on the part of the defendant. The servants of a street car company may not with impunity recklessly injure others even though the latter have been placed in positions of danger through their own negligence. It is well settled that even though one negligently places himself in a position of danger, another who causes him injury may be liable notwithstanding, if he does not take reasonable precautions to avoid doing injury when he has notice or such knowledge as ought to give him notice of the danger. But it is contended that this rule has no application when the negligence of the complaining party continues up to the time of the accident and is contemporaneous with the negligence of the party sought to be charged. That is true under some circumstances. But it is not always true that there is continuing negligence within the meaning of this qualification of the general rule merely because the complaining party remains in a position of danger in which he has negligently placed himself. If one after placing himself in a position that he knows or subsequently discovers to be dangerous cannot extricate himself from such position in time to avoid injury, or even if, though it may be possible to avoid the injury, it is clear to the other party that an ineffective method of avoiding it is being pursued or that the method pursued is not likely to meet with success, it would be the duty of such other party to avoid the injury, if he reasonably could, and he would be liable if he did not.

In the present case nothing was attempted to be done by those in charge of the car to avoid the collision until it was impossible to do anything. The question then arises whether the motorman or conductor knew or ought to have known that the boy was in a dangerous position, particularly by reason of the conduct of his horse, and that he was not likely to extricate himself. It may be that if there was nothing to indicate that there

was danger of a collision by reason of the fright of the horse there would be no negligence in conducting the car at a usual and proper rate when the boy was riding in the narrow place or that, if that would be negligent, it would be equally negligent for the boy to ride where he was, for it might be said that the conductor and motorman would be justified or not justified equally with the boy in considering that there was no danger so far as the boy's riding in the narrow space and the car's going at what would usually be a proper rate were concerned. But in this case the actions of the horse were such as would support a finding by the jury that there was danger of a collision and that those in charge of the car knew or ought to have known of such danger in ample time to avoid it, and that the boy, although attempting to avoid it, was very likely to fail.

There was nothing to obstruct the motorman's view. The road was straight and the car was coming down hill with nothing on the street in front for a long distance except the three boys on horseback. The horse began acting badly, or at least the jury might have so found, long before the car reached the place of the collision, and acted worse the nearer the car got. The motorman was facing the horse and was or ought to have been fully aware of the situation. He could easily control the car. The boy's back was towards the car, as he was going in the same direction some distance ahead. He was having difficulty with his horse and endeavoring to keep away from the car track on the northerly side. If, as the defendant contends, he could have crossed to the other side, which was wider, still the jury might have found that the danger of his position owing to the action of his horse did not become evident until it might have been equally or more dangerous to have crossed the track in front of the approaching car. But even if he might have crossed the track in safety and even if that would have been the wiser course for him to take, still it was or ought to have been apparent to the motorman that he was not intending to take that course, and the wisdom of taking that course after the horse began to act badly and the car drew near may not have

been apparent to the boy, whose back was to the car and who had his attention occupied with the actions of his horse. The defendant's summary of the testimony as to the conduct of the horse is not altogether accurate. The testimony was in part as follows: Kapena testified that "the horse was skittish and the car drew near and the horse began to prance or to show fright. . . He (Manuel) was a little ahead of us because that horse was acting more active than ours, he was sidling off and we were going slowly. . . When I said that the car was about as far from us as the statue out there (about 70 yards), that is the time the boy's horse was acting very fractious. . . The horse was so scared that the horse was endeavoring to go across because it was scared and the boy was endeavoring to keep the horse away from the track until the car run up and struck the horse. . . The horse was restive and prancing about and endeavoring to jump on to the track and the boy was trying to wrench him away from it. . . The horse was restive and throwing itself about until the car came up and struck the horse; the boy was endeavoring to keep it away from the track." Kaili testified that the horse was "prancing" when the car was a long way off. Fuller, who had ridden up on this car to the end of the line and had passed the boys on horseback when on that trip and who on the return trip in question had stood up from sitting on the rear seat looking backwards and turned around, testified, when asked what had attracted his attention, "Because we had gone up first and noticed him and we noticed him on horseback and we noticed that the horse acted curious. I wanted to take notice how the horse acted, whether he was still showing fear or skittishness as he did before. He was scared, jumping, prancing up and down, and jumping here and there from one side to the other." Holt, a witness for the defendant, testified: "A little ways down I noticed the horse was kind of jumping, the horse was standing, prancing, jumping." He began to jump "below Ahlo's gate (several hundred feet from the place of the accident.) The car was coming near us then on our way down,

when the car was kind of near to us the horse started to jump more and got frightened at the car then   .   .   .   jumped sideways toward the track and then the boy was holding the lines. I don't know if he was trying to keep the horse back I think from jumping, and then the horse turned around and faced the ditch instead of the track, he faced the ditch and backed on to the track." It is clear that there was sufficient evidence to support a verdict for the plaintiff.

It is contended next that the trial judge erred in giving certain instructions requested by the plaintiff and in refusing certain instructions and modifying others requested by the defendant in regard to contributory negligence. The law involved in these instructions has been considered already in a general way, and the arguments in regard to them are largely the same as under the more general points already covered, except that they are more specific in form. We need not go over the ground again. In our opinion, considering these instructions as a whole, their wording and the evidence in this case, as well as other instructions which partially cover the same ground, no reversible error was committed in connection with these instructions. Those requested on each side were taken from or based on statements in text books or decisions, and may all be substantially correct when considered abstractly or in connection with particular circumstances. But what may be a proper instruction in one case may not be in another. The defendant's contentions in regard to these instructions fall with its contentions disposed of on the question of the sufficiency of the evidence. Of these instructions, those given at the plaintiff's request are as follows:

5. "If the jury believe from the evidence that the motorman in charge of the car belonging to the defendant company knew or could have known by the exercise of ordinary care that the car under his control had so far excited the horse of the deceased or that the horse of the deceased was so far excited from any cause as to frighten him or render him unmanageable, then it became the duty of the motorman to take such steps for the safety of the deceased as ordinary prudence might suggest, and

if the jury further believe that the motorman failed in such duty and that in consequence of such failure the deceased met with his death, such failure constitutes negligence for which the defendant company is liable and your verdict must be for the plaintiff."

9. "Even should you believe from the evidence that the Waikiki side of the highway upon which deceased was riding at the time of his alleged wrongful killing was in better and more passable condition than was the Ewa side of said highway, and that the deceased was incautious in then riding upon and remaining on the Ewa side of said highway and the Ewa side of said defendant company's track, still the company was bound to the exercise of ordinary care and vigilance to avoid the accident. It could not recklessly and without proper care run its car, and then when injury resulted to a person, escape liability on the ground that such person was negligent in the first instance. The rule of law is not open to doubt that where the injured party was negligent, in the first instance, such negligence will not defeat recovery if it be shown that the defendant might have avoided the injury by the exercise or ordinary care and reasonable prudence."

10. "It is the duty of an electric railroad company to use all reasonable effort to avoid injury to one who has negligently or incautiously placed himself in a position of danger, if the peril is known, or by reasonable care might have been known, and a failure to observe this duty renders the company liable, notwithstanding the previous negligence of the person injured. If you believe from the evidence in this case that the deceased was negligent in riding upon the Ewa side of the defendant company's track and thereby placed himself in a position of danger, you will then consider whether or not his danger was known to the motorman of car No. 4 of the defendant company, or by reasonable care might have been known to the motorman and whether under the circumstances the motorman used ordinary care and prudence to avoid injury to the deceased; and if you are satisfied by a preponderance of the evidence that the motorman did know, or by reasonable care might have known, the peril of the deceased, and that he failed to use all reasonable efforts to avoid injury to the deceased, and that by reason of such failure the injury occurred, it will be your duty to return a verdict for the plaintiff."

The instructions asked by the defendant on this point and refused were as follows:

10. "Where the deceased sees an approaching car or is warned of its approach and does not take proper steps to avoid it, the company is not responsible for the accident."

13. "If you find from the evidence that the deceased was, up to the time that the car came up to him, upon the Ewa side of the track and outside the rails, and that as the car came up his horse suddenly turned across the track and was struck by the car, that he was thrown upon the track and run over by the car and killed, as there is no other evidence in the case upon which you can find a verdict for the plaintiff, I instruct you that if you find these facts, that your finding must be for the defendant."

14. "If a rider allows his horse to linger by the side of the street car line until the horse becomes unmanageable and dashes upon the track, the defendant would not be responsible for that act."

17. "If the gripman saw that plaintiff's horses were restive, it does not follow that he had reason to apprehend the accident that occurred. This fact alone would not be sufficient proof of negligence."

19. "Where by the slightest care and effort on the part of the deceased he could have put himself out of danger up to the time he was struck, although the defendant may have been negligent, no recovery can be had."

The instructions asked by the defendant but given only as modified were as follows:

5. "I instruct you that even though you find that the defendant was guilty of negligence, if you also find that the negligence of the plaintiff's intestate contributed to the loss complained of, you must find for the defendant."

This was modified by striking out "plaintiff's intestate" and inserting "deceased by his actions and conduct, directly and proximately," and by striking out "loss complained of" and inserting "happening of the accident complained of."

9. "A proper enforcement of the rights of the parties will defeat a recovery where the deceased has in disregard of the rights of the company placed himself in a position of danger, even if the collision was caused in part by failure of the company to exercise ordinary care."

This was modified by adding at the end: "Unless the employees of the defendant company in charge of the car could, by the exercise of ordinary care, have discovered the position of danger in which the deceased had placed himself, in time to have avoided the accident."

A second group of instructions in connection with which error is alleged, relate to the question of wantonness in the conduct of the defendant's servants in charge of the car. The errors alleged consist in refusals to give the following instructions requested by the defendant:

11. "If a horse takes fright at an approaching car, and because the car is not stopped, becomes unmanageable and runs away, injuring a rider ,whether the injury was ultimately caused by contact with the car or not, the company is not liable unless there is wanton or malicious disregard of the rights of the rider, of which there is no evidence in this case."

18. "If you find from the evidence that the deceased placed himself in a dangerous position with regard to the tracks and cars of the defendant corporation and continued in that position up to the time of the accident, when he could have changed his position to one which would not have been dangerous, although the defendant may be negligent, the defendant was guilty of contributory negligence and no recovery can be had. unless there is proof of wantonness or recklessness on the part of the defendant corporation or its employees."

20. "There is nothing in the circumstances of this case to indicate any wantonness or recklessness on the part of the defendant corporation or any of its employees."

These propositions are open to several objections. Numbers 11 and 20 particularly are objectionable because they practically amount to a direction to find for the defendant. Number 18 is objectionable not only because it tends by the use of the words "wantonness or recklessness" to indicate that something more than negligence or want of due care under the circumstances was required in order to render the defendant liable, but also because it appears to imply that the defendant would not be liable if the deceased could have got out of danger irrespective of the time when he could have done that, and irrespective

of what might have appeared to the motorman a probably ineffective effort on the part of the deceased to do that.

The next group of instructions to be considered relates to the rights of the defendant corporation in the streets. The defendant contends that error was committed in giving the following instruction requested by the plaintiff:

1. "I instruct you, gentlemen, that the defendant company had the right to use the public highway known as Liliha street and that the deceased had also the right to use that highway or any part of it. Neither of them had an exclusive right, but the right of the defendant company is superior to that of the general public in the use of that portion of the street occupied by its track or tracks, and whenever a person, wagon or other vehicle is on the track in advance of a car belonging to the defendant company he or it is bound to get out of the way when possible and not to obstruct the passage of the car. Further than this an electric company has no rights on a highway superior to the rest of the public."

And in refusing the following instructions requested by the defendant:

7. "The motorman was the servant of the quasi public corporation, which enjoyed privileges granted to it by the legislature in consideration of its duty to transport passengers safely and more speedily than they are ordinarily carried in vehicles drawn by horses. People who pay their money in the reasonable expectation of being carried expeditiously are not to be delayed by every person who ventures to test the nerve of a horse by riding it along the same street on which a company runs its cars by electricity."

8. "The defendant has from the necessities of the case and by the law a superior right of way on that portion of the street upon which it alone can travel paramount to that of those traveling in vehicles, on horseback, or on foot. This is not an exclusive right, but being to the extent stated, paramount, it will be enforced against all who needlessly impose obstacles to its free and unrestricted exercise. Other travelers therefore must yield the right of way."

12. "Motormen are not required to stop their cars and slack their speed because timid horses may become frightened or already manifest symptoms of fear. The public, for whose service the railway is being run, have a right to demand that its

regular schedule shall be carried out and that the company shall not be embarrassed by numerous delays, which would defeat the very purpose for which the franchise is granted."

The refusal to give number 7 is not made the subject of an assignment of error, but that and numbers 8 and 12 are misleading, too general and not applicable to the facts of this case. The defendant received the benefit of so much as might properly be given on these points in other instructions. Plaintiff's requested instruction number 1 is objected to because it does not recognize the defendant's statutory right of way and incidentally because it instants and limits the defendant's right of passage to the single case of a "person, wagon or other vehicle" on the track in advance of the car, and because it assumes that the deceased was on the track when, as contended, he was only near the track. It was unnecessary to state whether the defendant's right was statutory or other. We cannot perceive how the jury could have been misled by the reference to only a "person, wagon or other vehicle" in the illustrative way in which that reference was made. It does not appear that the horse was not on the track some of the time. Even if it was not on or between the rails it might have been within line of the side or running board of the car. The jury could not have been misled by such a technical inaccuracy, if it was an inaccuracy.

A number of alleged errors relate to rulings in admitting or excluding evidence. Several of these are relied on in the brief. The first, which is based on an alleged refusal to strike out certain testimony as to the plaintiff's duties in the warehouse in which he was employed, is without foundation, as the transcript shows that the testimony was stricken out. Another is based on a refusal to exclude the question put to a witness to "state from your knowledge and employment of labor, what the wages of a boy in this condition and similar station in life would be worth for Irwin & Company." This was asked of a witness who had long been in charge of the shipping department of Irwin & Co., where the plaintiff worked, and after testimony by this witness as to the plaintiff's work there, the work of stevedores there

generally, the deceased boy's ability to do such work, etc. The only objection made at the time was that the question was limited to Irwin & Co. We find no reversible error in allowing this question. Several questions were asked the plaintiff as a witness as to the work of the deceased in various particulars and, among others, in delivering milk that was sold by the plaintiff. Those in regard to the milk were objected to on the ground that proof that the services of the son were profitable to the father would not show the son's earning capacity. We cannot see that the defendant was harmed by the allowance of this question. A question was allowed to be asked the same witness as to the size of his family. There was no error in this. The only objection now made to all these questions is that they tended to prejudice the jury. The case relied on to show that there was error in this respect, *Fox v. Oakland C. S. Ry.*, 118 Cal. 55, is not in point.

There was no error in refusing to direct a verdict requested for the defendant on the ground that an action cannot be maintained in this Territory by a father for the death of a minor child. *Kake v. Horton*, 2 Haw. 209; *Puuku v. Kaleleku*, 8 Haw. 80; *Kekauoha v. Sch. Robert Lewers Co.*, 1 Estee 75; 114 Fed. 849. It is true that in the cases cited the actions were by widows for the deaths of their husbands, but the reasoning upon which the decisions were based is equally applicable to actions by parents for the deaths of their children.

It is contended finally that the damages awarded are excessive. The jury were instructed that the measure of damages is the pecuniary value of the child's services during his minority and the costs and expenses incurred by the parent on account of the injury, less the usual and reasonable expenses of caring for and rearing the child. The pecuniary value referred to in this instruction would include not only what the child might earn during the remainder of his minority but also the value of his services in the family, including acts of kindness and attention, but would not include anything by way of solatium, as, for the grief, anguish or wounded feelings of the plaintiff, and, of

course, would not include anything for the injury to the deceased. It would include the material as distinguished from the sentimental losses of the father. The only special expenses proved were the funeral expenses, amounting to $216.50. This deducted from the amount of the verdict, $3000, would leave $2783.50 as the amount awarded for the value of the child's services less the cost of caring for him. The evidence shows that the deceased was a boy 15 years old, well developed, healthy and strong. The plaintiff testified that the boy had completed his time at school two years before his death, that he looked after the cattle, took them to pasture, cut grass for them, milked the cows, delivered the milk to customers, chopped wood, etc., and that his services were worth $25 a month to the witness and might be worth $35 to others, also that the boy sometimes worked for others. There was also testimony by one who had long employed the plaintiff as a stevedore and had had much experience in employing stevedores and who had seen the boy in question, that the boy was probably capable of doing an ordinary man's work as a stevedore and that, if so, he could earn $2 a day in that class of work. The plaintiff had a wife and ten children. In view of this evidence, although the damages seem rather large, we cannot say that they were so excessive as to require a new trial or a remittitur of part of the damages. See *Franke v. City of St. Louis,* 110 Mo. 528; *Chicago & E. R. Co., v. Branyan,* 10 Ind. App. 577, 585, and cases collected in Hale on Damages, 324, note, and 15 Cent. Digest, 2675. Damages in cases of this kind are largely prospective and necessarily somewhat indefinite and incapable of being estimated with any approach to accuracy.

The judgment is affirmed.

*E. M. Watson* and *Holmes & Stanley* for plaintiff.

*Castle & Withington* for defendant.